**In re: James A. REDMOND, Debtor.**

**No. 96–B–03162.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Dec. 20, 2007.

---

9. The maximum length of time which the Court may grant is 180 days after the filing date. Fed. R. Bankr.Pro. 1006(b)(2).

David P. von Ebers, Toussaint & Carlson, Chicago, IL, for Debtor.

Edward J. Lesniak, Burke, Warren, MacKay & Serritella, Chicago, IL, for Fifth Third Bank.

## MEMORANDUM OPINION

EUGENE R. WEDOFF, Bankruptcy Judge.

This closed Chapter 13 case is before the court on remand after an appeal to the district court. At issue is the debtor's motion to reopen the case, pursuant to § 350(b) of the Bankruptcy Code (Title 11, U.S.C.), for the purpose of presenting a motion for sanctions against the debtor's mortgagee, with whom he is involved in a state court foreclosure action. This court originally denied the motion with a brief oral explanation. On appeal, the district court directed full consideration of the factors bearing on a motion to reopen. As discussed below, the motion to reopen is again denied because (1) there is no relief that can be awarded to the debtor in this court, (2) the state court can provide any relief to which the debtor may be entitled, and (3) the motion was untimely.

## Jurisdiction

Under 28 U.S.C. § 1334(a), district courts have "original and exclusive jurisdiction of all cases under Title 11," but they may refer such cases to the bankruptcy judges for their districts under 28 U.S.C. § 157(a). The District Court for the Northern District of Illinois has made such a reference through its Internal Operating Procedure 15(a).

Pursuant to this reference, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to "hear and determine all cases under title 11." Accordingly, this court has jurisdiction to determine whether the present case should be reopened. *See Virginia v. Collins (In re Collins)*, 173 F.3d 924, 928 (4th Cir.1999) ("[T]he bankruptcy court's power to reopen flows from its jurisdiction over debtors and their estates.").

## Findings of Fact

*Procedural history.* This Chapter 13 case began nearly twelve years ago. The debtor, James Redmond, filed the case in February 1996 to deal with a $70,000 balloon home mortgage that was in default and in foreclosure.[1] To keep his home, Redmond eventually proposed a Chapter 13 plan under which he would (1) cure the existing mortgage default, bringing his account current, (2) make future monthly mortgage payments as they came due, and then (3) pay the mortgage in full before its balloon payment date, April 1, 1998. However, Redmond did not pay the mortgage on that date, and as a result, his plan remained in effect only as to other debts, with the mortgage dealt with in a state court foreclosure proceeding. Redmond completed plan payments for the other

debts and received a discharge in his bankruptcy case on May 4, 1999. The bankruptcy case closed in 2001.

Four years later, Redmond first presented a motion to reopen his bankruptcy case, seeking to stay the foreclosure action. That motion was denied on the ground that the relief Redmond sought was an adjudication of the amount he owed on the mortgage—something that would properly be determined in the state court. (Hrg. Tr. at 3–5, July 12, 2005.) Redmond did not appeal this decision.

Nearly a year later, on June 12, 2006, Redmond filed the current motion. Once again, he sought to reopen his bankruptcy case, this time to present a motion for sanctions against the mortgagee bank. (Mot. to Reopen, ¶ 1.) The second motion to reopen was also denied, and this time Redmond appealed. The district court reversed the denial of the motion and remanded, directing this court to "take into account all pertinent factors in determining whether Redmond has presented cause for reopening his bankruptcy case." (Op. at 8.)

*The dispute between Redmond and the bank.* Redmond's claim for sanctions—the rationale for now reopening his bankruptcy case—is based on an alleged inconsistency between payment amounts set out in an agreed order, entered at the beginning of the bankruptcy case, and sums that the mortgagee later claimed in a payoff letter and in the state court foreclosure action.

In February 1996, shortly after Redmond filed this bankruptcy case, his mortgagee—Pinnacle Bank, now Fifth Third Bank—filed a proof of claim stating that in

---

1. The district court opinion states that the loan amount was $60,000, which is the amount supplied by Redmond in his appellate brief. (*See* Brief of Debtor–Appellant at 3). However, both Redmond's filings in this court and the bank's payoff letter support the $70,000 figure. (*See* Proposed Motion for Sanctions ("Sanctions Mot.," Exhibit A to the Motion to Reopen) ¶ 22 and Sanctions Mot. Ex. 9.)

addition to Redmond's current mortgage payments it was owed "arrears" of $13,317.25. (Sanctions Mot., Ex. 9.) The bank thereafter brought motions to dismiss the bankruptcy case and to modify the automatic stay and objected to Redmond's proposed Chapter 13 plan. (Bankruptcy Docket Nos. 20–22.) Its motion to modify the stay was granted with an effective date of April 23, 1996. (Bankruptcy Docket No. 39.) But before the bank could proceed with foreclosure in reliance on that order, Redmond moved to vacate the order modifying the stay and objected to the bank's arrears claim.

Redmond and the bank eventually settled these disputes, and they memorialized their settlement in an order that the court entered on June 18, 1996—the "Agreed Order" on which Redmond's claim for sanctions is grounded. (Bankruptcy Docket No. 55.) The order had several salient features:

- It reinstated the automatic stay as to the bank. (Agreed Order, ¶ 1.)

- It established a reduced arrears claim of $10,810.73 "for the purpose of the Chapter 13 reorganization plan." (*Id.*, ¶ 2.)

- It required Redmond to amend his Chapter 13 plan to make payments on the reduced arrearage amount that would satisfy the claim within 30 months and required that he make timely current mortgage payments in order to retain the protection of automatic stay, preventing foreclosure of the mortgage. (*Id.*, ¶¶ 3, 4.)

- It provided that if Redmond failed to make timely current payments, the automatic stay would terminate upon notice by the bank and a failure by Redmond to cure the current payment de-

fault within 10 days of the notice. (*Id.*, ¶¶ 4, 5.)

- It provided that "notwithstanding the cure provisions or the default provisions of this order, the [automatic] stay will automatically modify as to [the bank] on April 1, 1998 which is the date the balloon payment comes due on the note and mortgage which is the subject matter of this order." (*Id.*, ¶ 7.)

- It required the bank, upon any automatic modification of the stay pursuant to the order, to give notice to Redmond and the trustee and to file the notice with the court. (*Id.*, ¶ 8.)

Although Redmond did not obtain confirmation of a plan consistent with the Agreed Order until June 3, 1997, a year after its entry (*see* Bankruptcy Docket No. 88), it appears that he made timely payments both to the bank on the mortgage and to the Chapter 13 trustee. The trustee, in turn, disbursed payments on the bank's arrearage claim.[2]

In February and March 1998, Redmond demanded payoff letters from the bank in order to obtain a loan needed to pay the outstanding balance on the mortgage by the April 1 balloon payment date, as the Agreed Order required to avoid termination of the automatic stay. (Sanctions Mot., Ex. 6–7.) Redmond received payoff letters from the bank on March 3 and March 19 (*Id.*, Ex. 8–9), but he asserted that the letters overstated the payoff amount, and he and the bank's counsel exchanged correspondence regarding their positions on the correct payoff amount. (*Id.*, Ex. 10, 15.) In one of his letters, Redmond threatened "legal action" against the bank unless it provided a payoff letter according to his specifications. (*Id.*, Ex. 10.) However, as reflected in the bankruptcy docket, Redmond never brought

---

**2.** As of the balloon payment date, the trustee had paid the bank $7,659.24 on its arrearage claim, leaving a balance of $3,151.49. (Sanctions Mot., Ex. 5.)

the dispute to the bankruptcy court's attention, either before the balloon payment date or during the remaining several years before the bankruptcy case was closed.

Instead, Redmond and the bank litigated the question of the amounts due under the mortgage in a new state court foreclosure action that the bank instituted on July 1, 1998. (Sanctions Mot., ¶ 23.) Redmond never contended at any time during the pendency of his bankruptcy case that this foreclosure proceeding violated the automatic stay. Meanwhile, the bankruptcy case continued. Redmond made plan payments on other debts, which the trustee distributed, and Redmond received a discharge on May 4, 1999. (Bankruptcy Docket No. 103.) The case was closed on May 24, 2001. (Bankruptcy Docket No. 110.) [3]

The dispute over the amount Redmond owed on his mortgage—after seven years of proceedings—was set for trial in the state court on July 18, 2005. (Sanctions Mot., Ex. 11 at 8.) On June 30, 2005, however, Redmond filed a motion in the bankruptcy court to reopen his bankruptcy case and stay the foreclosure action, asserting that the bank was seeking to recover fees that had been covered by the Agreed Order. On July 12, when he presented the motion, this court denied it on the ground that the preclusive effect of the Agreed Order was for the state court to determine. (Mot. to Reopen, Ex. B at 3–5.) The next day, July 13, Redmond asked the state court to delay the trial so that he

could file a third amended counterclaim against the bank, raising his claim that the Agreed Order prevented collection of certain sums sought by the bank. (Mot. to Reopen, ¶ 5.)

Pursuant to an order of the state court, the bank responded with a memorandum opposing continuance of the trial, filed two days later, on July 15. (*Id.*, ¶ 7; Motion for Sanctions, Ex. 11.) The bank argued that its payoff letters and claims in the foreclosure action did not seek to collect fees treated by the Agreed Order and attached an itemization showing legal work performed by its counsel during the bankruptcy case.[4] The bank also argued that with out violating the Agreed Order, it "could collect, if it chose to do so, all amounts due to it," since the arrears amount set out in the Agreed Order did not itemize the charges that it covered and since it reflected a compromise in effect only "for the purpose of the Chapter 13 reorganization plan" rather than for foreclosure proceedings.

The record does not reflect the state court's ruling on the motion to continue, but nearly a year after briefing on the motion, on June 12, 2006, Redmond filed the current motion to reopen his bankruptcy case, this time so that he could file a motion for sanctions against the bank for violation of the automatic stay, the Agreed Order, his Chapter 13 plan, and his discharge. (Mot. to Reopen, ¶ 1.) At the heart of Redmond's request for relief was

---

**3.** The record does not explain the delay in closing the case, but a likely cause is the appointment of a new standing Chapter 13 trustee to administer the case shortly after discharge was entered. (Bankruptcy Docket No. 105.)

**4.** The itemization (Sanctions Mot., Ex. 15) reflects substantial work in addition to what would ordinarily be required to represent a mortgagee bank in a Chapter 13 case. Be-

tween the confirmation of the plan in May 1997 and the balloon date in April 1998, Redmond filed—and the bank's counsel addressed—at least four complaints against the bank with the Illinois Office of Banks and Real Estate, a complaint against the bank's attorney with the Illinois Attorney Registration and Disciplinary Commission, and a complaint with the Federal Deposit Insurance Corporation.

the itemization that the bank filed in the state court action on July 15, 2005, setting out a calculation of the fees in the disputed March 19, 1998 payoff letter. Redmond asserted that this itemization established that the bank was indeed seeking to collect fees foreclosed by the Agreed Order. Finding that this second motion to reopen again raised only questions regarding the correct amount due under the mortgage—and revealed no potential violations of bankruptcy court orders or the automatic stay—this court declined to reopen the case. The appeal, reversal, and remand followed.

### Conclusions of Law

■ Section 350(a) of the Bankruptcy Code addresses the closing of bankruptcy cases. It provides that "[a]fter an estate is fully administered and the court has discharged the trustee, the court shall close the case." Section 350(b), in turn, provides that a closed case "may" be reopened for specified purposes: "to administer assets, to accord relief to the debtor, or for other cause." The permissive language of this provision accords wide discretion to the court considering a motion to reopen. *In re Bianucci*, 4 F.3d 526, 528 (7th Cir.1993) ("[T]he decision whether to reopen a case is within the broad discretion of the bankruptcy court."); *In re Rosinski*, 759 F.2d 539, 540–41 (6th Cir.1985) ("[D]ecisions as to whether to reopen bankruptcy cases ... are committed to the sound discretion of the bankruptcy judge.").

■ In exercising this discretion, courts have considered a number of factors. The Seventh Circuit has said that the power to reopen a case under § 350(b) is "reserved for matters such as the correction of errors, amendments necessitated by unanticipated events that frustrate a plan's implementation, and the need to enforce the plan and discharge." *In re*

*Zurn*, 290 F.3d 861, 864 (7th Cir.2002). Another decision summarizes the case law as follows:

> [W]hen a former debtor seeks to reopen a closed bankruptcy case ... the court should consider a variety of non-exclusive factors including: the length of time that the case has been closed, *see Matter of Case*, 937 F.2d at 1018; whether a non-bankruptcy forum, such as state court, has the ability to determine the dispute to be posed by the debtor were the case reopened, *see, e.g. In re Tinsley*, 98 B.R. 791 (Bankr.S.D.Ohio 1989); *In re E.A. Adams, Inc.*, 29 B.R. 227 (Bankr.D.R.I.1983); *In re Hepburn*, 27 B.R. 135 (Bankr.E.D.N.Y.1983); whether prior litigation in bankruptcy court implicitly determined that the state court would be the appropriate forum to determine the rights, post-bankruptcy, of the parties; whether any parties would be prejudiced were the case reopened or not reopened; the extent of the benefit which the debtor seeks to achieve by reopening; and whether it is clear at the outset that the debtor would not be entitled to any relief if the case were reopened. *See generally Arleaux v. Arleaux*, 210 B.R. 148, 149 (8th Cir. BAP1997); *In re Carberry*, 186 B.R. 401, 402 (Bankr.E.D.Va.1995) (a bankruptcy court "should not reopen a bankruptcy case where it appears that to do so would be futile and a waste of judicial re sources")....

*In re Antonious*, 373 B.R. 400, 405–06 (Bankr.E.D.Pa.2007).

■ The issues raised by Redmond's motion to reopen coalesce around three of these factors: (1) the need to enforce Redmond's plan or other rights arising from his bankruptcy case, (2) the appropriate forum for determining the rights of Redmond and the bank, and (3) the timeliness of Redmond's request for reopening.

Each of these factors weighs against reopening the case.

### 1. *Entitlement to bankruptcy relief*

■ Under § 350(b), cause must be shown for a case to be reopened, and the moving party has the burden of demonstrating that cause. *See, e.g., Mass. Dep't of Revenue v. Crocker (In re Crocker)*, 362 B.R. 49, 53 (1st Cir. BAP 2007); *In re Padilla*, 365 B.R. 492, 503 (Bankr.E.D.Pa. 2007). The only cause cited in Redmond's current motion to reopen is his proposed motion for sanctions. Unless that motion has at least facial validity, then, there is no cause for reopening. *See Arleaux v. Arleaux*, 210 B.R. 148, 149 (8th Cir. BAP 1997) (holding that a motion to reopen was properly denied when brought only to present a groundless complaint). Although Redmond argues that the bank violated the Agreed Order, the automatic stay, his Chapter 13 plan, and his discharge, all of these alleged violations come down to the same conduct: the bank set out in its payoff letters, and sought to collect in the foreclosure proceeding, mortgage charges that Redmond asserts were disposed of by the Agreed Order. But even if Redmond's assertion about the scope of the Agreed Order were correct, this conduct violated no court order or any right accorded to a debtor in bankruptcy.

■ a. *The Agreed Order.* It is well established that bankruptcy courts retain jurisdiction to interpret or enforce their own orders even after a case is closed. *See Beneficial Trust Deeds v. Franklin (In re Franklin)*, 802 F.2d 324, 326 (9th Cir.1986); *Koehler v. Grant*, 213 B.R. 567 (8th Cir. BAP 1997). However, nothing in the Agreed Order created any obligation on the part of the bank that Redmond could seek to enforce. The Agreed Order had a simple operation: it reinstated the automatic stay, preventing a foreclosure from going forward, and allowed Redmond to pay off his mortgage on or before its balloon payment date, as long as Redmond (1) proposed an amended plan that included payments of an agreed arrearage amount, amortized over 30 months, and (2) made timely payments of all other obligations that became due on the mortgage or his plan. The order itself did not require the bank to do or refrain from doing anything that affected Redmond.[5]

b. *The automatic stay.* The Agreed Order reimposed on the bank the automatic stay defined by § 362(a) of the Bankruptcy Code, which, in paragraphs (a)(1), (4) and (6), prohibits actions to recover on claims that arose before the bankruptcy case was commenced and actions to enforce liens against property of the debtor or the debtor's estate. Thus, while the automatic stay was in effect, the bank was prohibited from attempting to enforce its claim against Redmond or his home outside of the bankruptcy case.

■ Redmond's proposed sanctions motion suggests two ways in which the bank might have violated the stay, but both are groundless. First, Redmond points to the bank's payoff letters, which he contends included amounts that were eliminated by the Agreed Order. However, whether the payoff letters were correct or incorrect is irrelevant to the question of whether the stay was violated. The letters were not attempts to collect, but simply statements of the bank's position as to what was owed.

---

**5.** As discussed below, the Agreed Order did require the bank to file with the court notice of modification of the automatic stay as of the balloon payment date, but any failure to file that subsequent notice had no effect on the stay modification. Redmond, of course, was fully on notice that the bank considered the stay terminated, given his participation in the foreclosure proceedings.

The bank did not seek payment by issuing the letters; rather, it issued them in response to Redmond's demand, prompted by his desire to make a voluntary payment of the mortgage debt.

There is authority that such a payoff letter can violate the automatic stay. *In re Sullivan*, 367 B.R. 54 (Bankr.N.D.N.Y. 2007), for example, holds that a payoff letter requested by a Chapter 13 debtor violated the automatic stay because it included attorneys' fees that the court found improper. The decision, though, is not persuasive. If a payoff letter with an incorrect loan balance were an attempt to collect the underlying debt, then a payoff letter with the correct balance would also be an attempt to collect. The automatic stay makes no distinction between collection activities based on the accuracy of the amount claimed. All activity to collect prepetition debts or enforce prepetition liens is prohibited. For both accurate and excessive claims, collection efforts are prohibited. Thus, if Redmond's position were correct, *all* payoff letters requested by debtors in bankruptcy would violate the automatic stay—a position completely without support in either precedent or bankruptcy policy.

■ Second, Redmond argues that the bank's long-pending foreclosure action is a violation of the automatic stay because the bank failed to give notice that the automatic stay terminated, pursuant to the Agreed Order, at the time of the balloon payment. Redmond simply misreads the Agreed Order. For defaults either in regular monthly mortgage payments before the balloon or in payments under the Chapter 13 plan, the Agreed Order, at ¶¶ 4 and 5, did in-

deed require notice from the bank, triggering an opportunity for Redmond to cure the default, before the stay would be modified. In these situations, notice was a condition precedent to relief from the automatic stay. But ¶ 7 of the Agreed Order provided for modification of the stay at the time of the balloon payment, "notwithstanding the cure provisions or the default provisions of this order." Termination of the stay at the time of the balloon payment was not subject to notice and cure. Paragraph 8 of the Agreed Order required the bank to give notice of stay modification under any of the order's provisions, but this duty could only arise after the stay was modified; it could not be a condition precedent to stay relief. Thus, the stay did terminate on the balloon payment date, and any failure by the bank to file a notice of the termination with the court did Redmond no harm.[6]

■ c. *The Chapter 13 plan.* Redmond's allegation that the bank violated the plan and confirmation order in the bankruptcy case stems from the bank's including in its payoff letters amounts that were scheduled to be paid through the plan. (Motion for Sanctions, ¶ 36.) As discussed above, the plan incorporated the terms of the Agreed Order, reducing the bank's arrearage claim to $10,810.73 and requiring satisfaction of that claim through plan payments over 30 months. At the time the payoff letter was sent, these plan payments had not been completed. Redmond asserts that by failing to deduct the balance due on the arrearage claim from the total due under the mortgage, the bank "was attempting to recover those fees and expenses twice—once from Debt-

---

**6.** Through his involvement in the later foreclosure proceedings, Redmond was well aware that the bank considered the automatic stay terminated. The bank's failure to file a notice to this effect may have resulted in the

Chapter 13 trustee making payments on the bank's arrearage claim that would otherwise have been withheld, but any such payments would simply reduce the claim that the bank could assert in the foreclosure proceeding.

or and a second time from the Chapter 13 Trustee." (*Id.*, ¶ 37).

There is no basis for this assertion. The payoff letter stated the bank's position as to the outstanding balance of the mortgage, without regard to how that balance would be paid. If the balance had been completely paid through a refinancing, the Chapter 13 plan could have been modified to stop further payments of the arrearage claim. *See* 11 U.S.C. § 1329(a)(3) (providing for modification of Chapter 13 plans to "alter the amount of the distribution to a creditor . . . to the extent necessary to take account of any payment . . . other than under the plan"). On the other hand, the bank could hardly have released its lien on the property while payments were still owed on the mortgage. Stating the full balance due in the payoff letters was not only consistent with Redmond's plan, it was essential to allow the refinancing that Redmond was seeking.

d. *The discharge injunction.* Redmond's last basis for claiming that the bank should be sanctioned for bankruptcy-related misconduct is that the bank violated the discharge injunction by attempting to collect in the foreclosure proceeding sums that were part of the arrearage claim included in Redmond's Chapter 13 plan and so discharged.

■ The problem with this argument is that it misunderstands both the nature of the bank's claim and the extent of a bankruptcy discharge. Contrary to Redmond's assumption, the bank did not have separate claims for a "mortgage"—which Redmond acknowledges was not discharged—and an "arrearage" that Redmond contends was discharged. Rather, the bank had a single claim: a right to payment under a promissory note, secured by a mortgage. The relevance of the amount in default under the mortgage is that one option for treating a claim in Chapter 13, under § 1322(b)(3) or (5), is "cure" of defaults. These provisions permit a Chapter 13 plan to provide for paying past due amounts and then satisfying the balance of a debt according to its terms. By filing a claim only for "arrears," the bank facilitated a plan to cure Redmond's mortgage default.[7] But curing the default was only one part of the required treatment of the bank's claim. A "cure" under § 1322(b)(3) left the balloon untouched, and that balance had to be paid to satisfy the claim. The Agreed Order recognized this aspect of the plan: by the balloon payment date Redmond had to have satisfied the bank's claim by paying the full balance due on the mortgage or the bank could enforce its rights outside the bankruptcy case. When Redmond failed to pay the balance of the mortgage, he defaulted under the plan and lost any right to a discharge of the bank's claim.[8]

---

[7]. For claims secured only by mortgages on the debtor's principal residence, with due dates extending beyond the five-year maximum term of a plan, cure of default and maintenance of current payments, under § 1322(b)(5), is the only permissible plan treatment, since § 1322(b)(2) otherwise prevents modification of the creditor's rights. *See Nobelman v. American Sav. Bank,* 508 U.S. 324, 328–30, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (explaining the statutory scheme). Because Redmond's mortgage did not extend beyond the term of his plan, cure of default was not the only option, but as expressly provided in § 1322(c)(1), a default in a shorter term mortgage may be cured under § 1322(b)(3), and this was the option chosen by Redmond and incorporated into the Agreed Order and plan.

[8]. Section 1328(a) provides for a discharge in Chapter 13 only "after completion by the debtor of all payments under the plan." Since Redmond was given a discharge, the parties apparently treated the mortgage as removed from the plan when the automatic stay terminated.

■■■■■ Moreover, a bankruptcy discharge could never have affected the bank's right to foreclose on its lien. The effect of a discharge is governed by § 524(a) of the Bankruptcy Code. That section provides that a discharge voids personal judgments against the debtor (§ 524(a)(1)) and operates as an injunction against acts to collect debts "as a personal liability of the debtor" (§ 524(a)(2)), but it does not avoid prepetition liens. Unless the lien of a secured creditor is avoided during the bankruptcy case under another provision of the Code or the claim is fully satisfied, a discharge does not prevent the debtor from seeking an *in rem* recovery against property securing its claim. *See Johnson v. Home State Bank,* 501 U.S. 78, 84, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) ("[A] bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor *n personam*—while leaving intact another—namely, an action against the debtor *in rem.*"). Redmond has never suggested any basis for avoiding the bank's lien and, in any event, he made no attempt to do so during his bankruptcy case. Accordingly, to the extent that the bank's claim was not satisfied during the bankruptcy case, the bank was entitled to pursue its collateral in a foreclosure proceeding, even if the claim had been subject to discharge.

### 2. *The appropriate forum*

Although Redmond's motion reveals no basis for seeking bankruptcy-related sanctions, he may have other grounds for challenging the bank's mortgage claim; he may even have grounds for challenging the bank's good faith in pursuing its claim. However, these matters are all properly addressed in the state court foreclosure action, another factor weighing against reopening. *See In re Elias,* 188 F.3d 1160, 1162 (9th Cir.1999) (affirming a bankruptcy judge's decision against reopening a case to determine a question of entitlement to attorneys' fees because the matter was pending in state court and "the state court [was] fully capable of resolving the fee dispute.").

The underlying dispute between the parties here is the amount of Redmond's debt to the bank, a question of state law. There are no special bankruptcy rules for calculating the amount due under a mortgage subject to cure of defaults in Chapter 13. To the contrary, § 1322(e) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." If a mortgagee has any liability for providing incorrect information in a payoff letter, that too would be a matter of nonbankruptcy law. *See, e.g., J.A.O. Acquisition Corp. v. Stavitsky,* 23 A.D.3d 200, 803 N.Y.S.2d 527 (N.Y.App. Div.2005) (considering alleged misstatements in a payoff letter under New York law governing negligent misrepresentation).

Much of Redmond's argument is based on his contention that the Agreed Order determined disputed amounts to which the bank was entitled as of the date of its entry. But as this court noted in connection with ruling on both of Redmond's motions to reopen, the extent to which the order determined amounts now claimed by the bank in the foreclosure proceedings is properly determined by the foreclosure court, not this court. *See Pettibone Corp. v. Easley,* 935 F.2d 120, 123 (7th Cir.1991) ("Disputes about the effect of a decision in one case on the prosecution of another are for the judge presiding in the second case.")

Finally, to the extent that Redmond believes that the bank has acted in bad faith

by deliberately including in its foreclosure action charges that it knows are foreclosed, Illinois rules of procedure provide an ample remedy. *See* Ill. Sup.Ct. Rule 137 (substantially identical to Rule 11, Fed. R.Civ.P.).

To render judgment in the foreclosure action, the state court must necessarily determine the amount that Redmond now owes to the bank. *See* 735 ILCS 5/15–1504, 1506 (2006) (required pleadings and form of judgment in judicial foreclosure). All of the issues Redmond can properly raise on that question are properly before that court.

### 3. *Timeliness*

■ The timeliness of a motion to reopen is crucial to its consideration. *See, e.g., In re Nylon Net Co.*, 225 B.R. 404, 405 (Bankr.W.D.Tenn.1998) ("It is well settled that the greater the elapse of time between the closing of the bankruptcy case and the request to reopen, the more compelling the reason for reopening the case should be.") (citing *Citizens Bank & Trust Co. v. Case (In re Case)*, 937 F.2d 1014, 1018 (5th Cir.1991)); *Helms v. Arboleda (In re Arboleda)*, 224 B.R. 640, 644 (Bankr. N.D.Ill.1998). In considering a motion to reopen for purposes of avoiding a lien (an action that could only take place in the bankruptcy case), the Seventh Circuit held that reopening was properly denied where an eight-month delay in bringing the motion resulted in prejudice to the lienholder. *In re Bianucci*, 4 F.3d 526, 528–29 (7th Cir.1993).

Redmond's delay in this case dwarfs that in *Bianucci*. He first learned of the bank's position about the balance due on his mortgage through payoff letter he received in March 1998. Within days of receiving those letters, Redmond challenged their accuracy and threatened legal action. However, he did not take action in the bankruptcy court before the balloon payment date, when resolution of the dispute might have facilitated refinancing. Instead, he litigated the matter in a state court foreclosure case for seven years. Only when a trial of that case was about to commence—and after the bank had incurred the fees and expenses involved in bringing the case to that point—did Redmond first seek to reopen his bankruptcy case, by which time the case had been closed for four years, the judge who had presided over the case had retired, and the records of the case had been archived. Upon rejection of his first motion to reopen, Redmond waited another year before bringing the current one.[9]

■ The Seventh Circuit has firmly rejected the belief "that anyone who has been a debtor in bankruptcy has eternal access to federal court for all disputes related in some way to the debts handled in the bankruptcy proceeding." *In re Zurn*, 290 F.3d 861, 864 (7th Cir.2002). Redmond's conduct in this case is another example of that mistaken belief, and another factor weighing heavily against reopening his bankruptcy case.

### Conclusion

For the reasons set forth above, Redmond's motion to reopen this bankruptcy case will again be denied. A separate order will be entered so providing.

---

9. Redmond asserts that he could only file the current motion after he obtained the itemization of the bank's mortgage charges in the foreclosure case. (Sanctions Mot., ¶¶ 4, 11.) This assertion merely emphasizes Redmond's practice of delay. He received the itemization on June 15, 2005; the current motion was filed on June 12, 2006.